
IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY JOSEPH WITZIG,<br><br>Petitioner,<br><br>v.<br><br>RICK HILL, Warden,<br><br>Respondent. | Case No. 1:11-cv-01825 MJS (HC)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY** |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Randy S. Kravis. Respondent, Rick Hill, as warden of Folsom State Prison, is represented by David A. Eldridge, of the Attorney General's Office for the State of California. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 4, 11.)

I. **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on February 20, 2009, of attempted murder, assault with a firearm, and shooting at an occupied motor vehicle. (Clerk's Tr. at 118-19.) The trial court also found true enhancements including that Petitioner personally used a firearm,

1  personally and intentionally discharged a firearm, personally and intentionally discharged
2  a firearm causing great bodily injury, that he had suffered two prior serious felonies, and
3  sentenced Petitioner to serve an indeterminate term of thirty-two (32) years to life. (Id.)

Petitioner's direct appeal, filed with the California Court of Appeal, Fifth Appellate District, was denied on July 15, 2010. (Answer, Ex. A, ECF No. 12.) Petitioner filed a petition for review with the California Supreme Court. (Lodged Doc. 7.) The Supreme Court summarily denied the petition on September 15, 2010. (Lodged Doc. 8.) Petitioner filed the instant federal habeas petition on November 23, 2011. (Pet., ECF No. 1.) In his petition, Petitioner presents a single claim, alleging his right to due process and right to trial by jury were violated when the trial court imposed a twenty-five (25) year to life sentence based on a firearm enhancement that was not found true by the jury.

Respondent filed an answer to the petition on December 20, 2011, and Petitioner filed a traverse on December 16, 2011. (Answer & Traverse, ECF Nos. 12, 14.)

## II.  STATEMENT OF THE FACTS[1]

### PROCEDURAL SUMMARY

> On January 9, 2009, the Tulare County District Attorney charged defendant with attempted murder (Pen. Code, §§ 664, 187;**[FN1]** count 1); assault with a firearm (§ 245, subd. (a)(2); count 2); and shooting at an occupied motor vehicle (§ 246; count 3). The information further alleged in connection with each count that defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)), and that he had suffered two prior serious felony convictions (§ 667.5, subd. (b)). In connection with count 1, the information alleged defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)).
>
> > **FN1**. All statutory references are to the Penal Code unless otherwise noted.
>
> A jury found defendant guilty on all counts and found true for all counts the allegations that defendant personally inflicted great bodily injury and personally used a firearm in the commission of the crimes. As to count 1, the jury found not true the allegation that defendant committed

---

[1] The Fifth District Court of Appeal's summary of the facts in its July 15, 2010 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

the attempted murder willfully, deliberately, and with premeditation. The verdict form for count 1 omitted the firearm discharge allegation.

**FACTS**

Defendant and Samuel Tapo became friends in jail. After their release, they stayed in contact for the next few months, mostly to buy drugs from each other. A week or so before the shooting, defendant called Samuel and asked him to help find his girlfriend. Defendant said he had lost her in Delano and she had run off with another man, supposedly one of Samuel's friends. Samuel agreed to help defendant in exchange for drugs.

On the morning of April 13, 2008, defendant and Samuel met in Delano. They had already been looking for the girlfriend for a few days. Samuel encouraged defendant to leave the girlfriend alone and let her come back to him, but defendant insisted on searching for her. That day, defendant and Samuel planned to visit certain people defendant suspected might be with his girlfriend. The people were Samuel's friends and defendant wanted Samuel along to help avoid trouble. Defendant gave Samuel a black .40-caliber Glock handgun in case the people were armed and did not want to relinquish the girlfriend.

After they visited some people, Samuel and defendant got into an argument. Samuel stopped the car and gave the gun back to defendant. Samuel told defendant he needed to stop disrespecting and pointing guns at Samuel's friends. In response, defendant accused Samuel of knowing where his girlfriend was. Defendant and Samuel parted ways, and Samuel prepared for that evening's rooster fight.

Meanwhile, defendant called Samuel repeatedly to request a meeting that evening. Defendant said he needed a favor. Roger Pentecost, with whom Samuel had been friends for years, called Samuel and said they should all meet at Roger's house. Roger and defendant would wait for Samuel until the rooster fight was over. Samuel agreed.

After the rooster fight in Pixley, Samuel drove to Roger's house with a friend named Oscar, who had borrowed a black Infinity because it was big enough to hold the roosters. When Samuel and Oscar pulled up, they parked with the driver's side closest to the house. Defendant and Roger were in the front yard. When Samuel got out, he showed them his new roosters that had just won the fight. Roger asked Samuel something about the girlfriend, but Samuel did not answer. Defendant told Samuel he had something in the back yard for him and asked if he wanted to go back there. Samuel agreed and told Oscar to wait in the front. As they walked to the back yard, Samuel noticed men stationed at the sides of the houses. Roger told Samuel to step inside the house and they went into a room in the back of the house where Roger slept. Samuel sat down on a couch. Defendant took a gun from the front of his pants, handed it to Roger, and said, "[H]ere, thank you." Roger put the gun away. Defendant kept his other hand behind his back. Samuel asked defendant what he wanted, and defendant answered, "Where is my girl at?" Samuel said, "[W]hat girl, man? … [Y]ou are crazy." Defendant accused Samuel of lying and knowing where she was. Samuel insisted he did not know. Samuel asked Roger, "[W]hat's wrong with him?" and Roger said, "[H]e wants his girlfriend back." Roger said someone had told defendant that Samuel was

3

lying and he knew where the girlfriend was. Samuel said he was leaving and he walked out the way he had come. Defendant and Roger followed.

Samuel walked to the Infinity. Oscar was already starting the car. Oscar said he wanted to leave quickly because he did not feel right; he saw men across the street. Samuel said he wanted to drive, so Oscar moved over to the passenger seat. Oscar advised Samuel that if he was not lying, he should help defendant find his girlfriend. Samuel said he was not going to help defendant. He wanted to take his roosters home.

Defendant approached the Infinity and spoke to Samuel, who was sitting in the driver's seat with the door open. Samuel did not see defendant's gun because he was facing Oscar, but Oscar got out of the passenger side and took off running. Standing about five feet from Samuel, defendant fired a shot down at the car. Then he pointed the gun at Samuel and told him to step out of the car. After Samuel told him he was not going to get out of the car, defendant shot him. The gunshot threw Samuel down onto the passenger seat and he struggled to get back up into the driver's seat. He attempted to speak, but blood was coming out of his mouth and nose. Roger asked defendant, "[W]hy did you do that for?" Defendant ran back into the house. Samuel started the car and drove himself to the hospital.

At the emergency room, Samuel was treated for three wounds--an entry wound in his left upper shoulder, an exit wound near his left clavicle, and an entry wound in the left side of his neck.**[FN2]** The Infinity was full of blood, which was dripping down the driver's seat onto the door frame. The roosters were still in the backseat.**[FN3]** There was a gunshot hole near the rear door on the driver's side. The bullet had entered at a downward angle and exited through the left rear tire. The trajectory suggested the shooter stood near the front of the car on the driver's side and shot into the rear fender.

> **FN2**. Dr. Edward Taylor, the surgeon who treated Samuel, testified that Samuel had three gunshot wounds--one to the mandible, one to the lower neck just above the clavicle, and one to the humerus area in the deltoid region. The wound to the humerus area might have been an exit wound. The doctor could not say how many bullets created the three wounds. The doctor did not operate on Samuel and did not locate a bullet. Samuel's drug panel showed he was positive for amphetamines. Samuel admitted to officers that he used methamphetamine on the day of the shooting.
>
> **FN3**. The car also contained a glass smoking pipe, a black pouch containing checks, and two pages of counterfeit $ 100 bills in the passenger door panel.

At the crime scene, officers found a substantial amount of blood on the driveway. Near the blood stains were shoe tracks, tire tracks, two shell casings that appeared to be .45 caliber, and a bullet that was consistent with a .45 caliber cartridge. Based on these findings, law enforcement believed Samuel had been shot with a .45-caliber bullet.**[FN4]**

> **FN4**. About four months after the shooting, medical staff gave officers a second recovered bullet.

4

Officers spoke to Roger, who identified a shooting suspect. They also spoke to Elroy, Thomas, and Kevin Knight, all of whom lived in the house with Roger. Kevin said he was in the back yard around 7:00 or 8:00 p.m. when he heard four or five shots from the front yard, followed by vehicles speeding away. Kevin said his grandfather was in bed and his father was also inside the house.**[FN5]** Samuel testified that he did not know the Knights.

> **FN5**. At trial, Kevin testified that he was alone in the backyard when he heard shots, followed by screeching car tires. Kevin lived in the house with his grandfather, his father, and Roger, who was his father's friend. About two minutes after the shooting, Kevin came into the house and saw his father sitting in a chair.

At first, Samuel did not tell the officers who had shot him. Then, when he was presented with a photographic lineup, he identified defendant as the shooter. Samuel never identified anyone other than defendant, and he identified defendant again at trial.

Samuel testified that he told the officers he was shot with a .40-caliber weapon because he assumed defendant shot him with a .40-caliber gun after seeing him with a .40-caliber Glock handgun that morning. Samuel testified that defendant had two .40-caliber Glock handguns and he gave one to Roger. But then Samuel admitted he could not tell the difference between a .40-caliber weapon and a .45-caliber weapon. He said he knew the gun defendant had given him that morning was a .40-caliber Glock because he read it on the gun. However, he was not sure if it was the gun defendant shot him with. Samuel thought they looked alike, but he had seen defendant with many other guns.

On April 17, 2008, Deputy Sheriff Cornett located and arrested defendant at a hotel in Bakersfield. Law enforcement had learned that a hotel room had been rented under his girlfriend's name. Defendant was in the room with his girlfriend and was in possession of a .40-caliber Glock model 22 handgun, ammunition, a Kevlar bulletproof vest, methamphetamine, and marijuana. Inside the girlfriend's vehicle, the deputy found ammunition and another bulletproof vest.

On cross-examination, Cornett testified there is "some difference" between a .45-caliber weapon and a .40-caliber weapon, but he added, "I wouldn't say it's completely significant." He agreed that .45 caliber is larger than .40 caliber.

**Defense Evidence**

Deputy Sheriff Pineda interviewed Samuel in the emergency room on April 14, 2008. Samuel was in pain and was lapsing in and out of consciousness, but he seemed able to understand the officer's questions. Samuel described the shooter as a person named Larry, who was White, bald, and in his late 20's. Samuel said they got into a confrontation because of some money over a chicken fight and also because of a girlfriend. Samuel said the weapon was a light green .40-caliber semiautomatic pistol.

Two days later, on April 16, 2008, Sergeant Cornett interviewed Samuel at the hospital Samuel told him defendant (Larry) was responsible for the shooting. Samuel explained that he, defendant, and Roger went to the back yard and then into a room at the back of the house. Samuel did not mention observing an exchange of any item between defendant and Roger and he did not mention seeing defendant earlier that day. Samuel said the weapon defendant shot him with was a .40-caliber Glock. He did not mention seeing any other Glocks that day or seeing Roger with a weapon. He did not mention that he and defendant had gone different places looking for the girlfriend. Samuel said defendant offered him $ 1,500 to help him find the girlfriend; he did not mention drugs. Samuel said defendant was standing behind him and over his shoulder when he fired the first shot.

Defendant testified on his own behalf. He explained that he met Samuel in jail and they agreed to meet after their release. When they did, they exchanged their knowledge. Defendant showed Samuel how to get good quality drugs, and Samuel showed defendant how to make counterfeit money and commit identity fraud.

On April 13, 2008, defendant was in Delano to see another person about his girlfriend, who had inherited some money. Defendant was afraid that Samuel and his friends were going to take money from his girlfriend. This was the reason defendant contacted Samuel. Defendant did not spend three days with Samuel and he did not give Samuel a pistol.

Defendant called Samuel's cell phone several times without success. When he finally contacted Samuel, he asked if they could meet and talk. Samuel agreed and suggested they meet at Roger's house. Defendant met Roger through Samuel, and defendant had been to Roger's house several times with Samuel. That night, they met at Roger's house after dark at about 8:00 p.m.

When defendant pulled up to the house, he noticed the black Infinity. Defendant got out of his car and walked toward Samuel and Roger. Defendant was carrying a .40-caliber Glock, the only gun he had. The three men walked to the back yard and went inside the back room of the house. Defendant saw that Roger had a gun in a shoulder holster. Samuel pulled a gun out, put it on the table, and said, "What do we need to talk about?" Defendant put his gun down too, but Roger remained armed. Defendant thought it was hot in the room, so he suggested they go back outside. They picked up their guns and walked out the back and toward the front yard. At that point, defendant asked Samuel where his girlfriend was. Samuel responded that he wanted $ 1,500 and an ounce of methamphetamine. Defendant said, "[F]uck you." Samuel said nothing, but continued walking to the Infinity. Defendant saw a man approach Roger, who had stopped. When Samuel stopped near the Infinity, defendant said, "[W]hat's up?" Samuel responded, "What's up? I ain't getting what I want. Why should I give you what you want?" As Samuel continued toward the Infinity, defendant said, "[W]e ain't fucking done yet," and he moved to grab Samuel. Samuel turned away from defendant and the first gunshot rang out. Defendant thought it came from his side. He saw Samuel move toward the Infinity. Defendant went to the ground and stayed low as he moved toward his own car, which was in the driveway. As he did, he heard a second gunshot. Defendant made it around to the driver's side of his car and looked through the windows. He saw "two

6

shadow figures taking off towards the far corner of the house." Defendant got in his car. As he started it and backed up, he heard tires screeching. He looked over his shoulder and saw the Infinity taking off.

Defendant found his girlfriend about two days later. They were together when he was arrested in possession of illegal drugs, a loaded .40-caliber Glock, and bulletproof vests.

On cross-examination, defendant denied knowing Elroy, Thomas, or Kevin Knight. He had known Samuel since they were released from jail about six months before the shooting. They did a lot of business together and were good associates. Defendant had no problems with Samuel. Defendant did not know Roger well; they had met a few times, but not on a regular basis, and they were not related in any way. Defendant was married, but not to his girlfriend, whom he had known since about a year before the shooting. Defendant was initially concerned that Samuel was going to steal money from his girlfriend. Defendant wanted to find her so he could protect her. Defendant suspected that Samuel knew where she was, and Samuel's demand for money told defendant "everything [he] needed to know right there."

Defendant said it was dark on the night of the shooting. There were no lights on at all and moonlight was the only illumination. Defendant could not describe the fourth person, who was "just a shadow." He explained that he "could not see his color, his race, his hair, nothing." Defendant did not see the weapon or anyone firing it. He was busy trying to get away and find shelter because he was afraid someone was shooting at him. When he heard the first gunshot, he was about 10 or 15 feet from the Infinity and could see it in his peripheral vision.

Defendant explained that he was standing on the driver's side of the Infinity, facing the rear of the car, and Samuel was standing in front of him (apparently facing him). Defendant heard a gunshot coming from his right. When Samuel moved toward the Infinity, he cleared the path for defendant to move around the back of his car to the driver's side. Defendant started his car, pulled out of the driveway, and left. He was scared and worried, so he went to a casino to gamble.

Defendant said the gun he possessed when he was arrested was the same gun he carried on the night of the shooting. Defendant could not explain why no one had located the weapon he claimed Samuel was carrying that night.

On redirect examination, defendant said his testimony regarding distance and time was based on estimations.

**Rebuttal Evidence**

On rebuttal, Deputy Sheriff Cornett testified that he spoke to Elroy, Thomas, and Kevin Knight, and also to Roger on the night of the crime. Law enforcement responded to the scene 90 to 120 minutes after the shooting because they were not aware of it until Samuel arrived at the hospital.

People v. Witzig, 2010 Cal. App. Unpub. LEXIS 3943, 2-16 (Cal. App. 5th Dist. May 26, 2010).

7

## II. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B. Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

#### 1. Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that

contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

### 2.   Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim,

later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion

requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3. Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin v. Lamarque, 555 F.3d at 834.

## III. REVIEW OF PETITION

### A. Claim One: Imposition of Enhancement Not Found True by Jury

As his first ground for relief, Petitioner alleges his right to due process and right to trial by jury were violated when the trial court imposed a twenty-five (25) year to life sentence based on a firearm enhancement that was not found true by the jury.

#### 1. State Court Decision

Petitioner presented this claim on appeal to the Fifth District Court of Appeal. The claim was denied in a reasoned decision by the Fifth District Court of Appeal and summarily denied by the California Supreme Court. (See Answer, Ex. A, Lodged Docs. 7-8.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v.

Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the appellate court explained:

**I. Defective Verdict Form**

> Defendant contends the 25-year-to-life enhancement on count 1 (attempted murder) for personally and intentionally discharging a firearm, causing great bodily injury (§ 12022.53, subd. (d), henceforth § 12022.53(d)) cannot stand because the verdict form did not include the allegation and thus the jury did not make a true finding on the allegation. He asserts that we should modify the sentence.
>
> We agree that the verdict form for count 1 should have included the firearm discharge allegation, but we conclude that because the jury necessarily made the factual findings to support the allegation, its omission from the verdict form did not invalidate the sentence on the firearm discharge allegation.
>
> **A. Facts**
>
> In this case, the information alleged as to all three counts that defendant personally used a firearm and personally inflicted great bodily injury on Samuel in the commission of the crime. As to count 1 only, the information also alleged that defendant personally and intentionally discharged a firearm, causing great bodily injury or death to Samuel (§ 12022.53(d)).
>
> The jury was instructed on the special allegations, including the section 12022.53(d) allegation.**[FN6.]**
>
>> **FN6**. The instruction stated that the allegation applied to all counts, but the information charged the allegation to count 1 only.
>
> The prosecutor's argument did not mention the section 12022.53(d) discharging allegation. The prosecutor argued:
>
>> "Briefly, last point, verdict forms. Now these can be complicated. You are going to get a total of six forms. First one is going to Count 1. This is the attempted murder count. There is going to be a spot there on top for you to fill out whether or not the defendant is guilty, not guilty. And then there are special allegations which follow.

12

> "The first one, premeditation. We spoke about premeditation. The second consideration, great bodily injury. I think everyone can agree that [Samuel] being shot, suffered great bodily injury. That's not a minor small injury. [P] The other consideration is that the defendant used a firearm. [P]
>
> "As to Count 2 you have two verdict forms. First one, Assault with a firearm. That's Count 2. And then there is going to be two special allegations if you are to find him guilty of Count 2. First one, that he inflicted great bodily injury on Samuel []. [P] Again, if you find that he is the shooter, and the testimony shows that he is, you can then consider whether or not [Samuel] had suffered great bodily injury. Being shot is great bodily injury. Again, whether or not the defendant personally used a firearm. [P] … [P]
>
> "Finally Count 3 has three verdict forms…. But Count 3, shooting at an occupied vehicle. You are to determine whether or not he is guilty or not guilty of shooting at an occupied vehicle. The elements of which are somebody being in a vehicle and the defendant shooting that person in the vehicle. Not necessarily hitting that person but shooting while that person is in the vehicle. [P] The testimony shows that there was a warning shot as [Samuel] was getting into the vehicle. That is enough. If you believe his testimony, then he is guilty of Count 3. After that consideration you have two special allegations. One, defendant personally inflicted great bodily injury. Although it's not necessary for the People to show that there was an actual bullet that struck … [Samuel], you can find that if it did strike him and the second shot did while he was in the vehicle, that it could have inflicted great bodily injury, which it did because it's a gunshot wound. And then again the other allegation is the personal use of the firearm."

The verdict form for each count included a firearm use allegation and a great bodily injury allegation, all of which the jury found true, but omitted any reference to the firearm discharge allegation.

**B. Analysis**

"A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court. It must be upheld when, if so construed, it expresses with reasonable certainty a finding supported by the evidence." (People v. Radil (1977) 76 Cal.App.3d 702, 710.) "The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]" (People v. Mackabee (1989) 214 Cal.App.3d 1250, 1256.) "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" (People v. Webster (1991) 54 Cal.3d 411, 447, fn. omitted, cert. den. (1992) 503 U.S. 1009.) "The verdict is insufficient only 'if it be susceptible of a different construction than that of guilty of the crime charged.'" (People v. Jones (1997) 58 Cal.App.4th 693, 711.) The same rules apply to a finding on a sentence enhancement allegation. (Ibid.)

> "'[T]he jury's function [is] to find whether the facts necessary for conviction [have] been proven, by assessment of the evidence admitted at trial in light of the court's instructions defining the types and quanta of facts necessary for conviction. The verdict, culminating this process, [is] the jury's statement whether it [has] or [has] not found those facts.' [Citation.] '[T]he function of the verdict is to register the jury's determination of whether the evidence sufficiently establishes the facts that the instructions recite are necessary to conviction.' [Citation.] There is no need in this factfinding process for the enumeration in the verdict of all of the elements of the offense or enhancement. Where the jury is fully instructed as to each element of a sentence enhancement, it is not necessary that the verdict enumerate each of those elements." (People v. Chevalier (1997) 60 Cal.App.4th 507, 514.)
>
> By finding defendant guilty on each count, the jury necessarily made certain factual findings. By finding defendant guilty on count 1, the jury necessarily found that defendant intended to kill Samuel, and that he personally used a firearm and personally inflicted great bodily injury when he attempted to kill Samuel. By finding defendant guilty on count 3, the jury necessarily found that defendant intentionally shot at the occupied Infinity, and that defendant personally used a firearm and caused great bodily injury to Samuel when he shot at the occupied Infinity. Thus, the jury found that defendant personally used a firearm to intentionally shoot at the occupied Infinity, attempting to kill Samuel, but instead causing him great bodily injury.
>
> These factual findings fully supported a true finding on the section 12022.53(d) firearm discharge allegation, which required the jury to find that defendant personally and intentionally discharged a firearm during the commission of the attempted murder, and in doing so caused great bodily injury to Samuel. (See § 112022.53(d); § 12022.53, subd. (j) ["the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact"].) The findings that the jurors were able to make with the verdict forms they were given unmistakably expressed their intention to find the firearm discharge allegation true. Furthermore, defendant's substantial rights suffered no prejudice. Defendant was apprised of the allegation in the information, the jury was fully instructed on it, and the evidence overwhelmingly supported a true finding on it. No evidence suggested that defendant attempted to harm or kill Samuel in any manner other than by shooting at him in the Infinity.

People v. Witzig, 2010 Cal. App. Unpub. LEXIS 3943 at 16-22.

### 2. Legal Standard

In a line of cases beginning with Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court addressed the effect of various states' sentencing schemes, including California's determinate sentencing law, on a defendant's right to have a jury determine the facts a trial court considers when imposing a sentence. In

14

Apprendi, the Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. Following Apprendi, the United States Supreme Court decided Blakely v. Washington, 542 U.S. 296 (2004). In Blakely, the high court explained that the statutory maximum for Apprendi purposes "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, 542 U.S. at 303.

However, sentencing errors must withstand harmless error review which requires the Defendant to show prejudice. See Washington v. Recuenco, 548 U.S. 212, 215 (2006) (sentencing error requires showing of prejudice); Estrella v. Ollison, 668 F.3d 593, 598 (9th Cir. 2011) (same). On habeas review, it must be determined if the error had a substantial and injurious effect or influence on the sentence. Brecht v. Abrahamson, 507 U.S. at 637. Using that standard, relief must be granted if there is grave doubt that a jury would have found the relevant aggravating factor beyond a reasonable doubt. Estrella, 668 F.3d at 598.

### 3. Analysis

Under these circumstances, it simply cannot be said that Petitioner was prejudiced from the trial court's failure to submit to the jury the issue of whether Petitioner committed the act of attempted murder while personally and intentionally discharging a firearm, causing great bodily injury. On appeal the state court affirmed the sentencing decision of the lower court. While not properly instructed, the state court found that based on the guilty findings by the jury on each of the three counts, the jury necessarily made the relevant factual finding to show that the firearm discharge enhancement would have been found true. The enhancement required the jury to find that Petitioner personally and intentionally discharged a firearm causing great bodily injury. See Cal. Penal Code § 112022.53(d). According to the state court, in order to find Petitioner guilty of attempted murder, the jury made findings that Petitioner intended to

kill the victim, that he *used* (as opposed to discharged) a firearm during the commission of the offense, and caused great bodily injury. (See Clerk's Tr. at 99.) While the instruction for the attempted murder count did not instruct the jury to find that Petitioner discharged the firearm during the commission of the offense, the state court fund that the jury in finding Petitioner guilty of the third count, shooting at an occupied vehicle, necessarily found that Petitioner discharged the firearm to shoot at the vehicle and victim. Based on the combined findings of the jury, the Court found that the jury had found every element of the enhancement true, and that "[n]o evidence suggested that [Petitioner] attempted to harm or kill Samuel in any manner other than by shooting at him in the Infinity." People v. Witzig, 2010 Cal. App. Unpub. LEXIS 3943 at 16-22.

While the jury was not properly instructed, this Court concurs with the reasoning of the state court that the failure to properly instruct the jury was harmless error. See Brecht v. Abrahamson, 507 U.S. at 637. The jury found all of the factual elements of the crime and enhancement true, when the combined findings of the jury are taken into account. On federal habeas review, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht." Fry v. Pliler, 551 U.S. 112, 121 (2007). Petitioner, in his traverse, does not address the issue of whether the error was harmless. Instead, Petitioner continues to assert that the error was structural and the omission of the finding is a basis for relief. (See Traverse at 7 ("And the fact that respondent can make a case that the evidence overwhelmingly supported a true finding on that allegation in question does not compensate for its omission.").) This Court is bound caselaw that harmless error applies, and that the state court's decision that Petitioner was not harmed by the failure to have the jury make the appropriate factual findings was a reasonable application of federal law. See Washington v. Recuenco, 548 U.S. at 215; Estrella v. Ollison, 668 F.3d at 598. The state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court law. Accordingly, Petitioner's Apprendi error claim should be rejected.

## IV. CONCLUSION

Petitioner is not entitled to relief with regard to the claim presented in the instant petition. The Court therefore orders that the petition be DENIED.

## V. CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v.

McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   August 15, 2013         /s/ *Michael J. Seng*
UNITED STATES MAGISTRATE JUDGE